The first case is Intex Recreation v. Team Worldwide, 2020-11-41. Is it Mr. Carter? Yes, Your Honor. Please proceed. Yes, Trevor Carter on behalf of Intex Recreation Corp. So, just to set the groundwork here, for this proceeding there were a total of five IPR final written decisions that have been at issue in this appeal. I'm first going to be speaking about the two for which Intex is appealing. And you're going to take four minutes. Yes, then I will come back and then mainly address the three that TWW is appealing. So, for the first two, where PTAP had the decision of not unpatentable, those should... No, when you come back, please stop the clock. When you come back, that's rebuttal. So, that's not the place for you to raise issues on appeal for the first time. So, maybe you want to change your mind about four minutes. Okay, I'm sorry. I understood that I would talk about our appeal the same as the briefing. If you come back on rebuttal and raise issues for the first time, your opponent has no opportunity to respond. Understand. Understand. Thank you. You want to take 11 minutes now? I will likely take closer to 11 minutes. Yes, thank you. For the PTAP's decision of unpatentable, those should be remanded reversed for the following reasons. First, for the 872 proceeding, the PTAP based its decision on a phantom statement of preference that the Miller prior reference wanted its valve outside the housing. Let me ask you, if we affirm from across appeal, is your appeal moot? Yes. Yes, we are fine with that. So, I will be brief on those issues. Simply stated, there is no such statement of preference in the Miller prior art. And in TWW's briefing, TWW didn't address this linchpin issue to show where this supposed statement of preference is or even try to drum up where it might be implicit. For the 873 final written decision, for the first time in its final written decision, the PTAP added a requirement to the built-in claim construction requiring that the PAC be recessed. The parties did not understand recess to be a requirement. The term recess, the term recessed, neither one of those appeared anywhere in the institution decision. And in the party's briefing at the PTAP, the term recess was never used. And the term recessed only appeared once in the briefing in the secondary consideration sections. And this is a significant issue for the Perrienti. Do I pronounce that right? Yes. Prior art, but at least on the cross appeal, there are several non-Perrienti grounds that would make discussion of Perrienti unnecessary. That is correct. What do you think, while we're on this Perrienti ground, what do you think it means to be integrated, which presumably means more than not detachable, because the claim construction agreed on was integrated and non-detachable. What could that mean without some amount of recessing? It means that it is part of it. That doesn't help. It's, you know, looking at the plain and ordinary meaning for the term that was provided to... It must mean something more than stuck on well. So the issue here is, does it need to be recessed? Does recess need to be part of it? And the main issue with that specific point, because that's the only thing that we're talking about here, is that if there is a recess requirement, it renders language in a related patent that we'll be talking about in the next proceeding. It renders language in that patent. You referred to two, right? One of them is not quite the same family. One is the same family. That's right. The 950 is the exact same family. And they're the same claim built in, has the exact same definition. And in that claim, it says that it is built in and extends into. In the 018 patent, which is very similar technology, similar claims, but not related, that claim's built into and recessed. Okay, but nobody has actually considered the collateral estoppel effect of that in-text decision here. I realize that the board decisions in the first two cases here came before our in-text decisions, so the board didn't have occasion to look at it. But nonetheless, this would seem to be a case in which the limitation and the prior art that we considered in our in-text decision is quite similar, though it's a different patent, the 018 patent, that's quite similar to the patents here. And under Ohio law in the earlier cases, it would seem to be collateral estoppel. Right, that was not addressed by the PTAB, you know, based on the timing of what you're saying. But yes, in that... And you haven't raised it here either. Right, but when you look at the three patents, once again, just to kind of ground set, there's the term PAC that's used in the 950 patent, and we'll talk more about that when we get to the 950 patent. In the 394 patent, you have the term housing instead of PAC. In the 018 patent, you have pump body. And pump body has a definition that excludes an air outlet. So when you're looking at this... Excludes air outlets? The pump body does not include the air outlet. So to answer your question, I just want to make sure it's clear that when you're looking at these patents, when you're looking at what is built in, there are different terms that have slightly different meanings across these three patents. Now, to answer your question more directly on the integrated, it means it's unitized. The not detachable means that it cannot be removed. But I think that the real issue here is we're just looking at not what integrated means, but rather is there a recess requirement? And our point is that that renders superfluous the language in the related 950 patent. And then you can look at the 018 patent, and we believe that it also renders language superfluous in that patent, not related, but very, very similar claims. This new requirement, we believe, creates an Administrative Procedure Act violation because the PTAB didn't provide notice of the definition, nor did they provide an opportunity to respond. We also, based on the superfluous issue that I've discussed, believe that that claim construction is incorrect. I want to move to the three IPR, final written decisions TWW is appealing, unless you have any questions about the two IPR decisions we are appealing. Thank you. So for TWW's appeals, the PTAB's decision of invalidity should be affirmed because there are two separate IPR final written decisions, the 870 and 874, finding all the challenge claims unpatentable, and a third, the 871, that found the majority of the claims unpatentable. And these decisions are well supported by factual findings supported by substantial evidence. So do I understand, I guess there are two of them, the 870 and the 874, that are Chaffee and Wu, or Wu and Chaffee, and I guess it's the 874, it's sort of Chaffee altered a little bit by Wu, and the only real issue on Chaffee is whether the board's fact-finding about the teaching of the text of the Chaffee document, the specification, not the figures, teaches a skilled artisan that the housing will be connected to the inflatable body by the little 82 flap. Correct. And that's just a substantial evidence question. That is correct. And then there's the second question about a motivation to combine with Wu and a factual substantial evidence question about whether efficiency is a sufficient motivation, and then there's the commercial success objective addition. Are those the three issues? Yes, I believe those are the three issues. And if we were to affirm the board on that, all the rest of this particular case, the appeal and the cross appeals and the five IPRs doesn't need to be decided. Correct. Yes. So looking at the three final written decisions TWW is appealing, the PTAB decision should be affirmed because the PTAB, as you noted, Judge Serrano, provided a thorough analysis that Chaffee discloses a housing built-in to the inflatable body. There are also, for these appeals, an issue about the definition of the term inflatable body and TWW's position is that it is using prosecution disclaimer or disavow or lexicography that happened in the 018 file history, a patent that isn't related. It does have similar claims, but it isn't related. And this court, in the appellate decision that it has already issued for the 018 patent, found that that definition of inflatable body for the 018 patent was based on disclaimer, disavow, and lexicography. For the matters where goldsmith is a reference, TWW has raised an issue about goldsmith being analogous art, but this court has already found in the 018 opinion that a combination of perienne and goldsmith rendered, from a prima facie point, rendered the similar claims of the 018 patent invalid. In addition, we think that it's very clear, as the board found, that goldsmith is directed to the same problem of taking a fan and a motor that was outside of a bed and building it into the bed. Does each of the six combinations that the board found on the cross appeal apply to the same claims? For two, we are appealing all of the challenge claims. No, no, on the cross appeal. Oh, yes, yeah, there's a... Each of the combinations applies to the same claims. That is correct. Okay. That is correct. For the 871 patent, there are certain claims where Intex did not prevail, and we have not cross appealed those. But, yes, there is complete overlap on the two sides of the appeals. You are in your cross appeal time. You can continue or save it, as it were. Yep, I will save the balance of the time. Thank you. Mr. Hopkins. Thank you. May it please the court. Tony Wang founded Team Worldwide, also known as TWW, in the 1970s, and he dedicated himself to products and inventions that are related to inflatables like air mattresses. He's the named inventor on more than 100 patents. But the biggest, most financially successful of his inventions are at issue today, the inventions related to the built-in pump air bed. Are there other patents and other cases involving the same technology that are pending? No. No, Your Honor. This is it. This is it. There were other patents related to different technology that was incorporated into, they called a never-flat patent that Team Worldwide had. That involves a secondary motor, and it's not the fundamental built-in pump air bed designs that we're talking about in these patents. So it's a different technology. This would be the basis, the foundation that would be built on top of. Once you have this technology in place, there's additional technology that Team Worldwide developed later, and that's not at issue today. Today is the fundamental issue. The 018 patent came out as the first time anybody ever thought to put a pump, which used to be you would, for decades, you would have an air bed, and it would have, there would be a bladder or a balloon, and it would have a valve, and you would either manually inflate it or you would use an external electric pump to inflate it or deflate it. These claims are not limited to air beds, right? They're related to inflatable bodies. Right. So there's a fair bit of prior art that's showing pumps. Chafee, for example. It's undeniably in the thing that, in the inflatable body subject to your, whatever dispute you may have about whether it is an inflatable body. Thank you, Your Honor. So there's a difference between the 018 patent, which is prior to Chafee, and the 950 and the 394. And today, right now, this argument we're talking about, the 394, which came, I think, a couple of months after the Chafee priority case was. Chafee does not have a built-in pump. Chafee has, what Chafee was trying to do was keep an external pump that you could remove from the air bed and intentionally soak. That was the purpose of Chafee, was to have an external pump, but one that would- Yeah. The Chafee pump is undeniably recessed in the inflatable body, right? You say it's not built in because the housing is not properly connected. Yeah, so no, Your Honor. I think we would disagree with that. In Chafee, the point was that you recessed the profile of the pump. That is, you create a well in the bed, a divot or some sort of indentation and if you look at the background of the art, it actually talks about the idea of an indentation in the bed so that even though you have an external pump, it won't stick out so much so you can put the bed closer up against a wall or something like that without having the pump sit between the bed. What it talks about is being internal to the profile of the bed. That is, the line on the edge of the bed, basically the main embodiment is a cup that the pump would slide into and the pump is intended to come out. That is, it talks about a reversible connection and so since we're talking about that part, let me just jump to the argument here. There was an error that the board made with respect to Chafee in finding that it had a built-in pump and when you look at every embodiment of Chafee, there is a pump housing that's called housing 90. That's supposed in the figures. I'm remembering what you're talking about in the following way. Forget about the figures. Let's assume the figures don't show it but the text, the board said, did teach it. The board said that and that is the error we're trying to reverse as to Chafee and that matters to this pattern and it's going to matter to the 950 pattern and I'd like to explain that. What the board did is there were, forget the figures or whatever, but there were three components talked about in the text. There was the overall concept of a fluid controller. That's the overall concept which they talked about as 80 throughout the pattern. There was the pump housing that was 90 that went around the actual fan and motor and then there were two other components that are talked about in the pattern. One is the flange 82 which is kind of a plastic piece that goes around and the other is the back wall 83 which is the cup part that in the figure sits in the pattern. What the patent trial appeal board focused on was the idea that there was text that said flange 82 that lip could extend from housing 90. That is the lip could, instead of the lip being connected to the cup that sits in the bed, it could actually extend from the pump housing itself so that you have the pump housing with some kind of flange on the pump housing. It never said that means you don't slide the pump housing in and out of the bed and 82 is a flange. 83 is the cup that actually sits in the bed. First, even if you read, literally it's about a half a sentence on column five of Chafee. Even if you read that to mean that this is all one piece, pump housing and the flange, it doesn't say with 83 altogether. It doesn't say 90 plus 82 plus the cup. It just says the flange can go so then now you can have a piece that slides in with a lip on it. That's still reversibly connected but I think more importantly than that is if you keep reading in column five and we argued this repeatedly to the board and we never and this is rare I think. The board just never responded to the argument. I have never, I've been talking about this for years now and I've never heard a reasonable response to the fact that if you keep reading in column five, it tells you there are two possibilities in Chafee. One is that pieces of plastic will connect together. That is within fluid controller 80, some of the plastic will connect to other plastic. That would be for example 90 going into 83 or 82. It says there's another possibility and that possibility is if fluid controller 80 is one piece, the whole thing is reversibly attached to the bladder so all of the plastic, the cup, the flange, the pump, if it is all fluid controller 80 and either it's going to come apart from itself or the entire fluid controller 80 comes out of the bladder and I'll read it to you. It's at column five, lines 33 to 48 where flange 82 connects to housing 90 or another portion of fluid controller 80. It is preferred that such connection be reversible. That's how it starts. Meaning it could be or could not be reversibly connected. It is also possible to construct the inflatable device such that bladder 20 and fluid controller 80 are reversibly connected. So option one, you have a reversible connection between 90 and 82. Option two, you have the whole fluid controller come out of the bladder. But what it never ever teaches is option three, a permanently built in pump body or housing. And then it says why. Okay, why? And this is the last sentence of that paragraph. In either case, the reversible connection allows the removal of portions of the fluid controller 80 for repair or replacement preventing the entire inflatable device from having to be disposed of in the event of a failure of one component. So what Chafee teaches is you can have two pieces of plastic disconnect from each other. Or you can make all the plastic one piece and it disconnects from the bladder. But you need to do it one way or the other of those two options because otherwise this is the conventional wisdom that we've been talking about. Otherwise you would have a problem where if the pump broke you'd have to replace the whole air mattress. He doesn't want to do that. And so there's only two options taught in Chafee. This paragraph is pointed out to the board. You will not find an explanation or a response to that in the board's determination. And that is the only teaching in the pattern. So what they focused on was the idea that you don't have to have some plastic disconnect from other plastic. But what they never talked about is if that's true, the whole thing comes out of the bladder. Either way, Chafee tells you it has to be reversibly connected. He never thought of permanently building in a pump body into the bed. The first time that ever happened was Mr. Wang came up with it in the 018 patent and then expanded on it in the 950 and the 394. Only after that went to market, other people started doing it. Intex, Bestway, Coleman and others. But that's why Chafee does not show a built-in pump. And Wu... Yes. Just putting aside Chafee, there was also a theory here that Perottini disclosed the built-in feature, correct? The board found that Perianti did not have a built-in pump. Yes. And that was a correct finding. But in the Intex case, we held that it did satisfy an almost identical built-in limitation. So there is... Is that correct? I did not read the panel decision as saying that Perianti necessarily had a built-in pump body in the 018 case. What I read was... It says it explicitly. It says that you have to be at least partially recessed and that's language in the 018 patent, which is what the board was saying the built-in requires in these later patents. Yes, that's the same issue. Right, but they held that it wasn't recessed. Yes, that's the point. Right. In Intex, we held that it was. No, in Intex, we held that it wasn't recessed. It was an obviousness case only, not an anticipation case. In Perianti's prior art to the 018 patent. Yes, but it held that Periantini showed was built-in within the meaning of the 018 patent. And so that determination is a matter of plethora of stop and carries over here. No? Your Honor, with all due respect, I don't think so. Well, first of all, the 018 patent's not the same as the 394 patent. They're different. I understand, but we've had a plethora of stop applied between patents that have similar language in the same technology. So in the 018 patent, with the board, there was no anticipation. And what you're arguing would say... I'm not arguing. I'm sorry, Your Honor. What you're presenting about the other opinions is concept that would have been an anticipation position that would have been in that opinion. What actually happened is they said, look, Periantini would have to be modified to be recessed into this bed. And there's a lot of other art that dates back to the 1800s that shows that you would want to save space. And that's why you would do that. But the concept of built-in is that it's integrated into, right, and not removable from. And so the idea is you would cut a hole or something in the wall, and this would become part of the airbed. It wouldn't just sit on top, okay? So you want to save some time for the cross-appeal and rebuttal. You can do that or continue, and of course you will not be able to use it in the cross-appeal if it doesn't turn out that there's something to rebut. So it's your choice. Understood. I do want to... And I'm sure we'll be talking about Periantini more today, but I do want to quickly, and I might try to save a minute at the end of this, discuss the notion of secondary considerations, because this was... Even if you were to otherwise find there was some evidence throughout these appeals... And I... So, effectively, I... To talk in the briefing about these other points, I think we're hitting some of the core ones. But, Your Honor, Judge Lori had recently penned a decision in the Volvo-Penta of the America's LLC versus Brunswick Corp case that was just this August, 2023, U.S. App Lexis... The panel renders decisions on behalf of the court. Yes, Your Honor. 22303. That talks about what happens in a case that happened both in this 018 patent but also in the 394 patent, which is... The board found here that sales were likely due to unclaimed features. Right. Did that damage your argument? No. The board made an error in finding that there wasn't value that was specifically tied to the patent... These patented products. Something like 85% of all built-in pump airbeds practiced the 394 patent. There was evidence of that in the record. And that's the powered inflation-deflation using the movable conduit in the 394 patent. There is... When people would go to the store... And this is in the record that you can find. People would go to the store and they would look at beds that have the built-in pump feature with this inflate, power, inflate, deflate. Or all the same features but don't have the built-in pump inflate-deflate. And the built-in pump inflate-deflate one is more expensive. And they would regularly buy the one with the built-in pump with the powered inflation and deflation. So you have an apples-to-apples comparison where every other aspect of what you're buying is accounted for except for the patented design. Do we know that? That all of the other features of the non-built-in pump beds were the same as the features of the built-in pump beds? I don't remember seeing that. Well, Dr. Becker had testified that when you go through and he's a damages expert that we had, that when you go through and you look at this, he's accounted for other features. So if you had a Intex DuraBean bed without the built-in pump, you'd have an Intex DuraBean bed with the built-in pump. And that there's no reason a consumer would buy, would spend more money to buy the one, to buy the bed that has just the patented design except that they were willing to do that because they wanted the patented design. Okay, but in reviewing these products, he didn't address the question, at least I think that's correct. He didn't address the question of what other features besides patented features might be in these products. What he did was he assessed the industry to say it's the same feature set. For example, this is durability. Is my statement correct? I think he did actually do an analysis where he compared, for example, in Walmart. What he considered other features other than the patented features? What he considered was, yes, yes, yes. Where? Well, excuse me, Your Honor. I know I have, I have it, I have the citation in the 018 record and I'm not sure I have it in the 394 record. Excuse me for one second. Your time is expired, so please answer Judge Dyke's question and then move on. Yes. So this would be, it would be, this is discussed in our blue brief in the 018 case. I'm sorry, I don't have the site for the 394 case. They're page 30. And where he talks about the practicing versus the not practicing and it's appendix 11813 is the comparative analysis that was done in that case. Thank you, counsel. Okay. Mr. Kaga has a little more than three minutes if you need him. Yes. Thank you, Your Honor. I just wanted to address a few issues that were raised by Mr. Harkins. First, as far as anyone providing a response on Chaffee, you can look in the 394 870 final written decision at appendix pages 37 to 40. In the 394 871 final written decision at appendix pages 171 through 174, the 394 874 final written decision at appendix pages 433 to 435. So I took Mr. Harkins to be saying that, of course, the board discussed Chaffee and column five in particular of Chaffee, but not the crucial passage of column five, which he says indicates that the kind of built-in requirement was not taught by Chaffee without everything the built-in means, affixed through tab 82. Right. And those pages... To the housing as opposed to the cylindrical wall. Yes. And I'm happy to answer any specific questions. Was it addressed? Yes. And it was addressed at those pages. Okay. The board walked through in a very thorough analysis looking at the Chaffee patent, analyzing the sections of the patent, including what was discussed by Mr. Harkins to reach its well-supported conclusion. I might just also add one piece of Chaffee in claim one. As part of claim one, it says the fluid controller, which would include the pump, is permanently coupled to the bladder. So claim one of Chaffee, specifically contemplated that it was built in. And there was support for that when you look throughout column four and column five. I know you have limited time. Can I just switch you over to the secondary considerations? Yes. Why isn't the... Can you address in particular the evidence that Mr. Harkins referred to, I think, coming out of Walmart about holding everything else equal, a whole lot of people bought a more expensive of the two options, pump in bed, pump not in bed. Well, I would believe the evidence shows that the non-built-in pumps that are indisputably not covered here outsold the... Right, that's why I used the very precise language, a whole lot of people. That doesn't mean a majority. A lot of people valued the pump in, the recessed pump. Is that right or not? Or were there other features not held constant or what? Absolutely. There are many other features. And there's survey evidence. I'm sorry. Other features held constant between the outside the bed and the inside the bed. As I understand it, there is no comparability. So, Judge Dyke, your question that you asked Mr. Harkins was directly on point. We are not aware that that analysis was done or that that's part of the record in the appendix in this case. I think when you're looking at the unclaimed features, there's survey evidence that comfort, durability, many other things are more important to consumers compared to where the pump is located. And TWW's expert, its technical expert, Dr. Stevik, and its financial expert, Dr. Becker, agreed with that. They agreed that, for example, durability and comfort are more important features for consumers looking at beds. Thank you, counsel. The case is submitted.